```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ALABAMA
                   SOUTHERN DIVISION
```

FILED
99 JUL 20 AM 8:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

MARGARET STONE WESSON,                }
                                      }
        Plaintiff,                    }
                                      }      CIVIL ACTION NO.
v.                                    }
                                      }      98-AR-1481-S
                                      }
WORLD WIDE PAPER FACTORS, INC.,       }
d/b/a Paper Products Marketing,       }
Inc.,                                 }
                                      }
        Defendant.                    }

ENTERED
JUL 20 1999

## MEMORANDUM OPINION

Presently before the court is a motion for summary judgment filed by defendant, World Wide Paper Factors, Inc. d/b/a/ Paper Products Marketing, Inc. ("PPM"). PPM seeks judgment as a matter of law on all claims asserted against it by plaintiff, Margaret Stone Wesson ("Wesson"). Specifically, PPM seeks summary judgment on Wesson's claim that it violated Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA"). Wesson claims that PPM discriminated against her on account of her sex, female, and her age, 59, when it terminated her employment on August 1, 1997 and when it failed to rehire her into a different position that became open in late September, 1997. For the reasons hereinafter stated, the motion is due to be granted.

### Background

PPM is an international paper trading and distribution company with offices throughout the United States. Until March 15, 1999, one such office was located in Birmingham. The president of PPM, Jim Peters ("Peters"), and PPM's Vice President of Finance and Administration, Alice Knight ("Knight") were responsible for the Birmingham office. The office was originally



staffed by two employees, but later employed as many 13 people.[1]

Wesson was hired as the receptionist for PPM in September of 1993 through a temporary employment agency. She became a full time receptionist and regular PPM employee in December of 1993. Prior to her hire by PPM, Wesson had accumulated nearly 25 years worth of experience in sales. In addition to her five plus years in real estate sales, Wesson spent over 19 years working in the "inside sales" group of U.S. Steel. While at U.S. Steel, Wesson provided support to a U.S. Steel salesperson. Wesson claims that although she was only support staff in job title and salary, she actually performed the same functions as a sales representative. Wesson also worked as an "inside salesperson," a position which required her to take orders for products over the phone and occasionally make "cold calls" on prospective customers.

Due, in part to Wesson's experience in sales, PPM promoted Wesson to Customer Sales Representative ("CSR") when a position became open in January of 1994. Wesson's primary responsibility as a CSR was to support a Paper Trader. Wesson completed each transaction's necessary paperwork, performed order and entry work, communicated with the paper mill and the customer, was responsible for follow-up and problem solving, and occasionally arranged for the transport of the product.

Paper Traders at PPM bought and sold various products through transactions which required the Traders to locate the product, negotiate the buy price, fulfillment costs (freight, converting, and handling costs), and the selling price. Because the Birmingham office focused on the purchase

---

[1] Because PPM has a large number of employees elsewhere, Title VII's jurisdictional requirement is satisfied.

and sale of "off quality" board grades, Traders negotiated the price for each transaction based on their experience and knowledge of the industry. Wesson contends that she actually performed the job of a Paper Trader while working as a CSR. PPM vigorously disputes this contention.

Less than one year after being promoted to CSR, Wesson voluntarily returned to the receptionist position that she had previously occupied and which was then vacant. Wesson maintains that she returned to the receptionist position in an effort to help the office, which was having considerable difficulty filling the receptionist position. While agreeing to return to the receptionist position, Wesson contends that she asked Knight to "remember her" the next time a sales position became available and not to "write her off." Knight has no recollection of Wesson making these statements.

In her role as receptionist for a second time, Wesson took on additional responsibilities not required of her when she earlier served as receptionist. For example, Wesson acted as a "back-up" in the Customer Service and Traffic Departments, filling in for other employees who were out sick or on vacation. Wesson also served as Administrative Assistant to Jeff Page ("Page"), the Sales Manager. In recognition of her efforts, PPM agreed to continue the higher pay level Wesson had received as a CSR. Wesson excelled as a receptionist and was awarded three merit based pay increases over the next few years.

By the fourth quarter of PPM's 1996-97 fiscal year, the Birmingham office was having serious financial problems. In response to these problems, Peters and Knight instituted cost-cutting measures. The first attempt to curb the office's financial woes was a reduction in inventory

and restriction on trading activities. When this strategy did not work, Peters and Knight planned an elimination of two positions at the Birmingham office. The number of positions eliminated as part of this reduction in force eventually increased so that, in total, five positions were eliminated in 1997. Eliminations included:

| Employee | Sex | Age at Layoff | Date of Layoff | Position |
| --- | --- | --- | --- | --- |
| Tammy Letson | F | 23 | 4-7-97 | Traffic |
| Jeff Page | M | 51 | 5-15-97 | Trader |
| Robert Ford | M | 64 | 7-31-97 | Trader |
| Kathy Slay | F | 40 | 8-1-97 | Customer Service |
| Margaret Stone Wesson | F | 59 | 8-1-97 | Receptionist |

Wesson's position was targeted for elimination as part of the reduction in force. Wesson was informed on August 1, 1997 that she would be laid off, effective immediately. Though the ultimate decision to terminate Wesson was made by Peters and Knight, Wesson was informed of he decision by Linda Graf ("Graf"), the Birmingham General Manager. PPM provided Wesson with a severance package including salary and continued health benefits. PPM never hired anyone else to fill the receptionist position. Instead, the duties for which Wesson had been responsible were divided between two remaining employees.

Wesson contends that upon learning of her lay-off, she expressed to Graf an interest in being transferred or called back to a sales position with PPM. Graf has no recollection of discussing a sales position with Wesson. Later in the day on August 1, Peters phoned Wesson to express his regret that she had to be laid off and to inform her that he would provide a recommendation for future employment. It is undisputed that in the course of this phone call, Wesson told Peters that she would like to continue working for PPM in a sales position. Peters said nothing in

response to Wesson's expression of interest. At the time of Wesson's discharge, no openings in sales, or any other department at PPM, existed.

In September of 1997, PPM's most experienced Paper Trader, Hank Bollmer ("Bollmer"), resigned without notice. Bollmer's sudden resignation left the Birmingham office with only one Trader, Graf, at time when the office was financially strapped. PPM began searching for a replacement who would accept PPM's salary constraints and who had enough experience to come in and begin trading almost immediately.

On September 29, 1997, PPM hired Mark Long ("Long") to fill the vacancy left by Bollmer. Long had previously expressed an interest in working with PPM and had submitted a resume earlier in 1997. Both Graf and Knight were familiar with Long due to his work as Sales Manager for Custom Sheeting, the main outside warehousing/converting facility for the Birmingham office. Due to his work at Custom Sheeting, Long was familiar with PPM's products, customers, accounts, and other important aspects of PPM's business. Long also had demonstrated sales experience in the paper industry, though he had never held the position of Trader. Lastly, because he had recently been laid off by Custom Sheeting, Long was available to start immediately. Long is also the son-in-law of Jeff Page ("Page"), a former Trader at PPM.

In the end, the reduction in force did not save the Birmingham office from having to close its doors. The office officially closed on March 15, 1999. Only Graf remains affiliated with PPM in Birmingham. She now trades paper on PPM's behalf out of her home.

Based on the events described above, Wesson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"),

asserting that PPM terminated her because of her age, 59, AND her sex, female. Wesson's discrimination charge further alleged that PPM's decision not to hire her for the position that Long ultimately filled was also based on her age and her sex. In other words, plaintiff's claim is of intersectional or dually motivated discrimination. After receiving her Right to Sue letter, Wesson timely filed the complaint commencing this action.

### Discussion

As in any case involving claims of disparate treatment, a plaintiff must prove discrimination through either direct evidence or through circumstantial evidence. Direct evidence is evidence which, if believed, proves the fact sought to be established without any interpretation required. *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393-94 (11th Cir. 1997); *see also Clark v. Coates & Clark, Inc.* 990 F.2d 1217, 1226 (11th Cir. 1993); *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Circumstantial evidence <u>suggests</u> the fact sought to be established, but an inferential step is required. *Earley*, 907 F.2d at 1081.

Wesson contends that two statements constitute direct evidence of discrimination. Wesson first points to a statement made by Graf while Wesson, Graf, and several other PPM employees were attending a meeting. In response to a suggestion made by Wesson, Graf allegedly said (to no one in particular) "Boy, I bet she was good in her day and time" (Dep. of Pl., at 80). Second, Wesson testifies that during a conversation between some unidentified Traders, one Trader stated that "Mark Long wanted to learn

6

the paper business, and that [Graf] would probably hire him because he was a younger - he was a man, a younger man" (Id. at 91). Both of these statements are subject to interpretation. They may or may not indicate a bias by the speaker against females over 40 years of age in the employment context. Ordinarily, "direct evidence" is evidence that, if believed, leaves no doubt about intent. Here, the court gives plaintiff the benefit of her questionable interpretations, but rejects the statements as "direct evidence" because neither statement was made by a person with authority to bind the employees or to express a policy or attitude on behalf of the employer. *See Trotter v. Board of Trustees of the Univ. of Alabama*, 91 F.3d 1449, 1454 (11th Cir. 1996) ("for statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision").

Left with only circumstantial evidence to prove her charges of sex and age based discrimination, Wesson must rely on the burden shifting framework set out in *McDonnel-Douglas Corp. v. Greene*, 411 U.S. 792, 93 S.Ct. 1817 (1973). Wesson must establish a *prima facie* case of age and sex discrimination before the burden shifts to PPM to articulate a legitimate, non-discriminatory reason for its actions. Once PPM rebuts the inference of discrimination created by Wesson's *prima facie* case, Wesson then has the opportunity to prove that PPM's articulated reason is merely a pretext for discrimination.

**Termination Claim**

To establish a *prima facie* case on a claim of discriminatory discharge claim involving a reduction in force, Wesson must show that (1)

7

she was a member of a protected group that was adversely affected by an employment decision, (2) she was qualified for her own position or to assume another position available at the time of the discharge, and (3) there exists other evidence sufficient for a rational fact finder to conclude that PPM intended to discriminate against Wesson in making the discharge decision. *Standard v. A.B.E.L. Serv. Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998).

Wesson establishes the first two elements of her *prima facie* case of age discrimination by showing that she is over 40 and that she was qualified for her position as receptionist at the time of her discharge. For the purposes of summary judgment, the court will, contrary to the court's belief, assume that Wesson satisfies the third element of her *prima facie* case by submitting Graf's comment, "I bet she was good in her day and time," as circumstantial evidence of age discrimination.

PPM rebuts any inference of discrimination created by a *prima facie* case by articulating a legitimate, non-discriminatory reason for its decision to terminate Wesson. PPM explains that at the time of Wesson's lay off, it was suffering financially to such a degree that it instituted a general reduction in force. Employees laid off as part of the reduction in force were both under and over forty. Wesson's position was targeting because it was not a revenue producing position and was not essential to the functioning of the office.[2] Wesson submits neither evidence nor argument to demonstrate that PPM's articulated reason is merely a pretext for age discrimination. Consequently, her ADEA claim cannot survive

---

[2] The need for a receptionist was largely obviated by the installation of a voice mail system prior to Wesson's termination.

summary judgment.

With regard to Wesson's Title VII claim, which is, according to Wesson's complaint, not an alternative claim but a part of her claim of intersectional discrimination, the court notes that Wesson seems to have abandoned her sex-based discrimination claim. Although Wesson's complaint charges that her termination was due to her age <u>and</u> her sex, Wesson omits any reference to sex discrimination in subsequent submissions to the court. Wesson's brief in opposition to PPM's motion for summary judgment fails to discuss sex discrimination suggest to the court that Wesson has chosen to proceed only under the ADEA.

Even if Wesson had not abandoned her Title VII claim, with regard to her termination, PPM would be entitled to judgment as a matter of law on such a claim. For the purposes of summary judgment, the court will again assume that Wesson establishes her *prima facie* case. Wesson satisfies the first two elements by showing that she is female and was qualified for her position as receptionist at the time of her termination. The court will assume that the third element is satisfied by evidence that terminated male employees were transferred to other positions within PPM (Robert Ford ("Ford")) or provided assistance in obtaining work (Page), while female employees were not provided such assistance.

Any residual Title VII claim fails to survive summary judgment because Wesson is unable to demonstrate that PPM's proferred explanation for its actions is merely a pretext for sex discrimination. PPM explains that Ford was transferred to another location because he had a one year contract of employment with PPM. The transfer allowed PPM to avoid breaching their contractual obligation to Ford. Once the employment

9

contract with Ford expired, it was not renewed. PPM explains that it attempted to "soften the landing" for all employees who were terminated. It chose to do so for Page by providing him assistance in securing a position with Savannah River Paper Corporation. It chose to do for Wesson so by providing a severance package and recommendation for future employment.[3] Wesson has utterly failed to show that PPM's explanation is a pretext for sex discrimination and that PPM intended to discriminate against Wesson in making the discharge decision. PPM is therefore entitled to judgment as a matter of law on Wesson's claim that she was terminated because of her sex.

**Failure to Hire**

Wesson also complains that PPM discriminated against her because of her age and her sex when it failed to hire her into the position ultimately filled by Long. As stated above, the survival of Wesson's ADEA claim and Title VII is first contingent upon her ability to establish a *prima facie* case of discrimination under each relevant statute. A *prima facie* case of under the ADEA requires a showing that (1) Wesson was over 40 at the time of her rejection, (2) Wesson applied for and was qualified for the Trader position, (3) despite her qualifications, Wesson was rejected, and (4) after Wesson was rejected, PPM continued to accept applicants of similar qualifications. Title VII requires proof of the same elements, with the exception that "female" is substituted for "over 40."

---

[3] Kathy Slay, another employee laid-off by PPM, received a similar severance package.

PPM challenges Wesson's ability to a *prima facie* case under each statute. While conceding that Wesson is female and over 40, PPM raises serious questions as to whether Wesson's general expression of interest in other positions with PPM, constitutes an "application" for the specific position of Paper Trader. PPM notes that Wesson never submitted a resume or contacted PPM about the position when it did become open, and that Wesson expressed this interest several months <u>before</u> the sudden need for a Paper Trader arose. PPM also disputes that Wesson was qualified for the position of Paper Trader. Because PPM did not perceive Wesson to have "applied for" the Trader position or to be qualified for the job, it did not even consider Wesson for the position. PPM therefore argues that she was never "denied" the position. Lastly, because it argues that Long's qualifications were superior to and dissimilar from Wesson's, PPM also denies that it continued to "accept applicants of similar qualifications."

Notwithstanding PPM's arguments, this court will assume, for the purposes of summary judgment, that Wesson makes out a *prima facie* case of both sex and age discrimination. The burden shifts to PPM to rebut the inference of discrimination created by the *prima facie* case by articulating a legitimate business reason for its decision to hire Long. PPM meets this burden by restating many of the same arguments it used to attack Wesson's *prima facie* case. In short, PPM explains that it did not deny Wesson the position because of her age or her sex. It says that it simply did not consider Wesson for the position because she had not applied for it and was not qualified. Alternatively, it argues that Long was more qualified than Wesson to fill its special needs: an individual

11

experienced in paper industry sales, who could come in and begin trading immediately, and who would accept a low salary.

Other than the statement allegedly made by a group of unidentified Traders, and the comment Graf made during a PPM meeting, Wesson submits no evidence to support her claims of discrimination. These statements are insufficient to provide an evidentiary basis for a jury to find that PPM's explanation is a cover for impermissible discrimination.

It may be true that Wesson was just as qualified as Long. It may even be true that Wesson is *more* qualified than Long. But an employer is still free to prefer one applicant over another for any reason other than an illegal one,[4] and Wesson has failed to submit evidence upon which a reasonable jury could find that PPM's motive was discriminatory.

Because Wesson has failed to present evidence sufficient to demonstrate that PPM's articulated business reasons for each employment decision of which she complains are merely pretext for illegal discrimination, PPM is entitled to judgment as a matter of law. An appropriate order granting PPM's motion for summary judgment and dismissing the action will be separately entered.

DONE this 20th day of July, 1999.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

---

[4] For instance, Wesson continually notes that Long is Page's son-in-law. Under the facts presented, nepotism would be a permissible reason to favor one applicant over another.